UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KEVIN CHRISTOPHER MICHEAL TRIPP, | 4:17-CV-04076-KES |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION |
| ARTHUR ALLCOCK, Associate Warden, South Dakota State Penitentiary; JENNIFER DRESKE, Deputy Warden, South Dakota State Penitentiary; EUGENE REGIER, Doctor, South Dakota State Penitentiary; ROBERT VESTLIE, Senior Correctional Officer, South Dakota State Penitentiary; TAMMY TOP, Certified Nurse Practitioner, South Dakota State Penitentiary; all in their individual and official capacities, | |
| Defendants. | |

## INTRODUCTION

This matter is before the court on plaintiff Kevin Christopher Micheal Tripp's *pro se* amended complaint pursuant to 42 U.S.C. § 1983. See Docket No. 13. The district court screened Mr. Tripp's original complaint, and determined that two of the three claims he raised survived screening. Docket 7. Thereafter, Mr. Tripp requested and was granted permission to amend his complaint.

The district court screened Mr. Tripp's proposed amended complaint and determined that all three causes of action alleged in the amended complaint

survived screening.  Docket 12.  The amended complaint was filed as Docket 13.

The district court's screening order construed Mr. Tripp's amended complaint to allege:  Count I- deliberate indifference to Mr. Tripp's serious medical needs in violation of the Eighth Amendment right to be free from cruel and unusual punishment as against Dr. Eugene Regier, Certified Nurse Practitioner Tammy Top, Associate Warden Arthur Allcock and Deputy Warden Jennifer Dreske; Count II—deliberate indifference to Mr. Tripp's serious medical needs in violation of the Eighth Amendment right to be free from cruel and unusual punishment, as against Senior Correctional Officer Robert Vestlie; Count III—violation of Mr. Tripp's Fourteenth Amendment right to equal protection as against Deputy Warden Jennifer Dreske and Associate Warden Arthur Allcock.  See Docket 12 (district court's order screening Mr. Tripp's amended complaint).

Defendants have moved for the entry of summary judgment in their favor.  See Docket No. 26.  This matter was referred to this magistrate judge pursuant to the January 19, 2018, order of the Honorable Karen E. Schreier, district judge, and 28 U.S.C. § 636(b)(1)(A) and (B).  The following is this court's recommended disposition of defendants' motion.

## FACTS[1]

Defendants filed a statement of undisputed facts comprising 17 pages and 61 separately-numbered paragraphs.  See Docket 31.  Mr. Tripp did not file a response to defendant's motion, nor did he contradict any of the material facts asserted by defendants.  The facts as stated by the defendants, therefore, are deemed admitted pursuant to Local Rule 56.1.D.[2]

### A.    Parties and Claims

Plaintiff, Kevin Christopher Tripp, is an inmate currently incarcerated at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota. Docket 13, p. 1. He is imprisoned pursuant to a conviction for sexual contact with a minor. Schlimgen Affidavit ¶ 2; exhibit 52.

---

[1] References to exhibits are to the exhibits which are attached to the defendants' brief in support of their motion for summary judgment.  The foundation for these exhibits is provided by the affidavits of Jessica Cook (Docket 28); Catherine Schlimgen (Docket 29); and Tammy Top (Docket 30).

[2] South Dakota Local Rule 56.1.D. states, "**D. Effect of Omission:  Sanction.** All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's statement of material facts."

Mr. Tripp received a copy of the Local Rules, along with copies of the pertinent Federal Rules of Civil Procedure (including Federal Rule of Civil Procedure 56) when the district court issued its scheduling order on August 9, 2017.  See Docket 19.  Nevertheless, several months have passed since the defendants served and filed their summary judgment motion and supporting documents, but Mr. Tripp has never filed a resistance or response.

Mr. Tripp's failure to oppose defendant's statement of facts is *not* dispositive of defendant's motion. "Even if a motion for summary judgment on a particular claim stands unopposed, the district court must still determine that the moving party is entitled to judgment as a matter of law on that claim." Interstate Power Co. v. Kansas City Power & Light Co., 992 F.2d 804, 807 (8th Cir. 1993).

Mr. Tripp alleges that as a result of a car accident, he suffers from pain and that climbing stairs makes the pain worse.  Docket 13, p. 5.  In Count I of his amended complaint, Mr. Tripp alleges that Dr. Eugene Regier, Certified Nurse Practitioner Tammy Top, Associate Warden Arthur Allcock and Deputy Warden Jennifer Dreske all refused to issue an order allowing Mr. Tripp to reside in the bottom tier of the SDSP in order to eliminate the need for Mr. Tripp to climb stairs.  Id.   Mr. Tripp alleges that defendants Regier, Top, Allcock and Dreske's refusal to enter an order allowing Mr. Tripp to reside in the bottom tier of the SDSP constitutes deliberate indifference to his serious medical needs, in violation of the Eighth Amendment prohibition against cruel and unusual punishment.  Id.

Count II of Mr. Tripp's amended complaint alleges an additional deliberate indifference claim against Senior Correctional Officer Robert Vestlie. Docket 13, p. 5.  In this claim, Mr. Tripp alleges that on March 22, 2017, Officer Vestlie failed to open Mr. Tripp's cell door for medication pass. Docket 13, p. 6.  Mr. Tripp alleges that that Officer Vestlie's failure to open the cell door resulted in Mr. Tripp's inability to receive his medications for that night. Id.

Although alleging that this was "not an isolated incident," Mr. Tripp's amended complaint refers only to the incident which allegedly occurred on March 22, 2017.   Docket 13, p. 6.

In Count III of his amended complaint, Mr. Tripp alleges defendants Jennifer Dreske and Arthur Allcock violated Mr. Trip's Fourteenth Amendment

4

right to equal protection.  Docket 13, p. 7.  The basis for this claim is that Mr. Tripp alleges both he and his former cellmate are bisexual.  Id.  In his amended complaint, however, Mr. Tripp denies he and his former roommate were ever in a relationship.  Id.  Mr. Tripp alleges that Mr. Allcock and Ms. Dreske suddenly decided, after four years, that because Mr. Tripp and his former cellmate were both bisexual, they could no longer be cellmates or even live on the same tier of the SDSP.  Id.  Mr. Tripp further alleges that Mr. Allcock and Ms. Dreske informed Mr. Tripp the reason he could no longer be housed with his former cellmate was because he "suddenly had a PREA[3] history" with his cellmate.  Id.  Mr. Tripp also claims that defendant Allcock called Mr. Tripp a "faggot."  Id.

In the "Request for Relief" section of his amended complaint, Mr. Tripp asks the court to: order prison staff to house him on a bottom tier of the prison; to disregard sexual orientation when making its decisions; to pay his legal costs; to insure all medication is administered as prescribed; and to pay him one million dollars for his pain and suffering.  Docket 13, p. 8.

**B.    Undisputed Material Facts Relevant To Mr. Tripp's Claims**

**1.    Count I—Deliberate Indifference: Bottom Tier Order**

Mr. Tripp reported to Health Services at the SDSP on January 30, 2017, "with a chief complaint of left hip/femur pain." Top Affidavit ¶ 5; Exhibit 6. According to Mr. Tripp, the pain had been "present for two weeks."  Mr. Tripp requested a "bottom tier order as stairs aggravate rod." Id.  On that date, the

---

[3] Prison Rape Elimination Act.

medical provider's plan was to "review chart concerning leg pain, possible bottom tier order because of rod placed in femur in the past." Top Affidavit ¶ 6; exhibit 10. Mr. Tripp, reported he "suffers from pain due to car accident" that occurred prior to his incarceration. Docket 13, p. 5.  A review, however, of "previous x-ray of the area was WNL [within normal limits]." Top Affidavit ¶ 7; exhibit 10. It was therefore determined by medical staff that there was "no need for bottom tier order."  Id.

On February 21, 2017, Mr. Tripp complained to Health Services that he "feels that he is dragging his foot when he goes up the stairs" and was thus "looking for a bottom tier order." Top Affidavit ¶ 8; exhibit 5.  When he was seen by Health Services on February 21, 2017, Mr. Tripp threatened that he was "going to continue to come up to sick call until he has a bottom tier order." Top Affidavit ¶ 9; exhibit 5. He also stated he "doesn't want to file a lawsuit if he were to fall and hurt himself."  Id.

In response, Health Services again tried to "educate patient that he may not be suitable for a bottom tier order." Top Affidavit ¶ 10; exhibit 6. Mr. Tripp "stated that he will try the Tylenol even if it does not work." According to Mr. Tripp, "if I refuse something, it will count against me." Id.

On March 6, 2017, Mr. Tripp returned to Health Services again complaining that he was "recently moved to an upper tier" and that "climbing the stairs causes his left femur to hurt." Top Affidavit ¶ 11; Exhibit 4. The record, however, reflects that "previous femur x-ray completed in July of 2016 reveals the stable positioning of hardware and no acute process."  Id.

When examined by medical staff, Mr. Tripp "denies N/T in the leg or weakness" and complained of "just pure pain." Top Affidavit ¶ 12; Exhibit 4. He informed Health Services that he "does not want to have the Courts decide." Id.

Although Mr. Tripp was observed to have an "antalgic gait when leaving the exam room," the record reflects that he was "in no pain/distress." Top Affidavit ¶ 13; exhibit 4. It was recommended that Tripp undergo "PT eval and treat left hip/leg pain." Top Affidavit ¶ 13; exhibit 5.

Mr. Tripp returned to Health Services the following day, March 7, 2017, complaining of "increased pain due to the rod in his left leg." Top Affidavit ¶ 14; exhibits 3, 8. In response the nurse requested "chart review put in for provider concerning patient's request." Top Affidavit ¶ 14; exhibit 4.

As reflected in the medical entry/notation dated March 7, 2017, medical staff "discussed leg issues with him at appointment yesterday." Top Affidavit ¶ 15; exhibit 9. The record further reflects that an appointment had been scheduled with physical therapist in connection with Mr. Tripp's complaint of leg pain. Id.

When later seen by Health Services on March 27, 2017, to "discuss leg pain," Mr. Tripp was "educated to continue therapy as recommended by PT." Top Affidavit ¶ 16; exhibit 38. Mr. Tripp, however, became "argumentative about this and states he needs this for legal reasons." Id.

Health Services tried to "educate patient again he has recommendations from PT at this time and needs to continue to be compliant with this." Top Affidavit ¶ 17; exhibit 38. Mr. Tripp then "verbalized understanding." Id.

On May 30, 2017, Mr. Tripp returned to Health Services "with chief complaint of left leg pain when climbing stairs" and again maintained that it was "progressively getting worse." Top Affidavit ¶ 18; exhibit 2. He was therefore again "requesting an order for bottom tier or limited stairs." Id.

The record, however, reflects that when he was seen by Health Services on May 30, 2017, Mr. Tripp again had a "normal gait" and did not appear to be in any pain or distress. Top Affidavit ¶ 19; exhibit 3. A review of his medical records further reflects that "patient had been given home exercises for leg strength at PT." Top Affidavit ¶ 19; exhibit 8. Mr. Tripp was therefore advised, on May 30, 2017, that he "can address housing issues with DOC staff." Id.

Mr. Tripp, when later seen by Health Services on June 2, 2017, was again observed to have a "normal gait" and was able to "ambulate normally." Top Affidavit ¶ 20; exhibit 1. A review of his medical records indicates that Mr. Tripp was, on many of the occasions that he was seen by Health Services, described as having "normal gait." Top Affidavit ¶ 20; exhibits 1, 3, 19, 29.

On July 6, 2017, Health Services "received a phone call from the cell hall that patient was complaining of chest pain" and was therefore "sent to the clinic for evaluation." Top Affidavit ¶ 21; exhibit 32. Upon arriving at Health Services, "patient ambulates in the clinic without difficulty" and "appears to be

in no distress." The record reflects that Mr. Tripp "eagerly hops up on the exam table." Top Affidavit ¶ 21; exhibit 32.

Although he was said to have a "mildly antalgic gait" when seen by Health Services on August 29, 2017 for a chronic care visit, Mr. Tripp was "able to get on and off the exam table without difficulty." Top Affidavit ¶ 22; exhibit 27. When examined by medical staff, Mr. Tripp, unlike before, never mentioned anything whatsoever about "leg pain when climbing stairs." In fact, Mr. Tripp "offers no further medical concerns at this time." Id.

Mr. Tripp was later seen by Health Services on September 21, 2017, in response to complaints that he was "just stretching his arms up in the air" when he "started getting pain at the sternum" which he "describes as aching and sharp pains." Top Affidavit ¶ 23; exhibit 19. Mr. Tripp was "ambulatory with normal gait" when seen by Health Services on this date. Id.

Since June 2017, Mr. Tripp has been seen by Health Services on an ongoing basis in connection with a wide variety of complaints. Top Affidavit ¶ 24; exhibits 11-33. On none of those occasions, however, has Mr. Tripp complained to Health Services that it was "very painful to climb and walk up several flights of stairs." Top Affidavit ¶ 24; exhibits 11-33.

Prison officials, in denying Mr. Tripp's request for a "bottom tier order" relied on the opinion/advice of the medical professionals employed with Health Services at the SDSP. As noted in an Informal Resolution Response dated February 9, 2017, Mr. Tripp was advised by prison officials that "an advanced level provider reviewed your nurse sick call" in connection with his "request to

be placed on bottom tier." Schlimgen Affidavit ¶ 8; exhibit 39. The Informal

Resolution Response goes on to state that "No new orders were received."    Id.

Mr. Tripp, in an Administrative Remedy Response dated February 23,

2017, was informed by prison officials that "Health Services was contacted and

stated you do not have a medical order requiring you to be moved to the first

tier." Schlimgen Affidavit ¶ 9; exhibit 40.

In yet another Administrative Remedy Response dated February 28,

2017, Mr. Tripp was again advised that "Your chart has been reviewed by the

provider." Schlimgen Affidavit ¶ 10; exhibit 41.  The Administrative Remedy

Response further advised, "Your housing classification has no restrictions at

this time."  Id.

Mr. Tripp's medical records show evidence that suggests

malingering/feigning symptoms. The record dated June 2, 2017, in response to

complaints of "bilateral mid-back pain," states Mr. Tripp "ambulates normally

but holds his back while walking in the clinic." Top Affidavit ¶ 25; exhibit 1.

Once on the exam table, however, he "was no longer holding his back."  Id.

During this same visit to health services, Mr. Tripp, when asked to lift

his shirt up for assessment, "exaggerates positioning and slumps forward." Top

Affidavit ¶ 26; exhibit 1. Nursing staff "asked patient to sit up straight" but

Mr. Tripp "reports he is unable to due to pain." The nurse's observation,

however, reflects that "prior to nursing assessment, patient was sitting up

straight without difficulty." Id.

Unit Staff contacted Health Services on November 4, 2017, regarding Mr. Tripp and informed them that "patient will not respond to staff when knocking on the cell door and asking him questions." Top Affidavit ¶ 27; exhibit 12. When a nurse accompanied officers to the holding cell, "patient will not speak to nurse." When officers attempted to "sit patient up," he began "making slurring noises." Id.

The nurse then "placed water by patient's eyes to check for reflex." At that point, Mr. Tripp "yells what the f**k are you doing?" Top Affidavit ¶ 28; exhibit 12. Mr. Tripp suddenly "has clear speech at this time." Id.

Health Services attempted to conduct vital signs but "patient began yelling at nurse and states he is fine." Top Affidavit ¶ 29; exhibit 12. According to Mr. Tripp, he was just "ignoring staff because he was done talking to staff." Id.

Finally, Mr. Tripp's request for a "bottom tier order" is now moot as a result of his recent actions at the SDSP. During his October 27, 2017, visit to Health Services, Mr. Tripp informed medical staff that "I got a charge of attempted murder now." Top Affidavit ¶ 30; exhibit 15.

The Minnehaha County Grand Jury, on November 2, 2017, returned an Indictment charging Mr. Tripp with attempted first-degree murder. Exhibit 42. In that same indictment, Mr. Tripp was also charged with aggravated assault against department of corrections employee in violation of SDCL 22-18-1.05. Id.

11

As the result of his assaultive behavior and other acts committed within the institution, Mr. Tripp is no longer incarcerated in the West Hall of the SDSP. He was, on or about November 3, 2017, transferred to the Jameson Prison Annex (JPA) of the SDSP. Cook Affidavit ¶ 3.

Based on this current housing assignment, Mr. Tripp is no longer required to "climb and walk up flights of stairs." Cook Affidavit ¶ 10. The JPA, unlike the "Hill," contains only two (2) tiers of cells separated by a small flight of stairs. Since his transfer to the JPA, Inmate Tripp has, with the exception of approximately four (4) days, been housed on the bottom tier of his Unit. Id.

An Order was also entered, on or about November 20, 2017, whereby Mr. Tripp was assigned to Restrictive Housing Program at the SDSP. As provided in SDDOC Policy 1.3.D.4, Restrictive Housing is a "status for inmates whose continued presence in the general prison population poses a serious threat to life, property, staff, other inmates or the security and/or orderly operation of the institution." Cook Affidavit ¶¶ 8-9.

### 2.    Count II—Deliberate Indifference: Failure to Open Cell Door

Mr. Tripp asserts in his amended complaint that "Senior Correctional Officer Richard Vestlie failed to open Plaintiff's cell door for bedtime medication pass." Mr. Tripp's amended complaint alleges CO Vestlie failed to open the cell door during bedtime medication pass "several times," however, Mr. Tripp cites only one incident that he alleges took place on March 22, 2017. Docket 13, p. 6. This was the same and only incident grieved by Mr. Tripp pursuant to

SDDOC Policy 1.3.E.2, Administrative Remedy for Inmates. Schlimgen Affidavit ¶ 11; exhibits 43-46.

A review of his institutional file reveals that Mr. Tripp, in an Informal Resolution Request dated March 27, 2017, complained that "on Wednesday, March 22, 2017, approximately 8:15 p.m. Officer Vestlie did not open my door for medication." Schlimgen Affidavit ¶ 12; exhibit 43. In response to this IRR, Mr. Tripp was advised, in an Informal Resolution Response dated March 28, 2017, that "staff do their best to follow ring out lists." Schlimgen Affidavit ¶ 12; exhibit 44.

Mr. Tripp, in a Request for Administrative Remedy dated March 31, 2017, again complained that "on March 22, 2017 Vestlie failed to open my door for medication pass at 8:15." Schlimgen Affidavit ¶ 13; exhibit 46. As indicated in an Administrative Remedy Response dated April 28, 2017, Mr. Tripp was informed that "if your cell door does not open in the evening, it is important to ask for the OIC or to notify your Unit Staff the next day, instead of five days after the incident so staff may address the issue immediately." Schlimgen Affidavit ¶ 13; exhibit 46.

Mr. Tripp's medical records show he was also later seen by Health Services at the SDSP on March 27, 2017, in connection with a variety of complaints. Top Affidavit ¶ 32; exhibit 38. In addition to wanting to "discuss leg pain," Mr. Tripp indicated he "would also like to discuss getting his hibicleanse basin and antibiotic renewed." Id.  Mr. Tripp further complained that "about two days ago, he started having cold like symptoms." Id.

At no time whatsoever during this visit, however, did Mr. Tripp tell Health Services that he did not receive his medications on March 22, 2017, because "Officer Vestlie did not open my door for medication." Top Affidavit ¶ 33; exhibit 38. In fact, Mr. Tripp's medical records reflect that "there were no other areas of concern for patient." Id.

Mr. Tripp's institutional file reflects that the cell in which he was housed was equipped with an emergency call button. As indicated in an Informal Resolution Request dated June 21, 2017, Mr. Tripp was "having severe chest pains so I pushed the emergency call button." Schlimgen Affidavit ¶ 14; exhibit 47.

Although Mr. Tripp submitted various grievances in connection with Officer Vestlie allegedly not having opened his cell door on the evening of March 22, 2017, there is no indication that Mr. Tripp pushed the emergency call button in his cell in order to alert staff he had not received his medication. Schlimgen Affidavit ¶ 15; exhibits 43-46.

Finally, regarding Mr. Tripp's allegations that he "suffers from psychological disorders" and did not receive his medication on the evening of March 22, 2017, Mr. Tripp's medical records indicate he has a history of being "inconsistent with taking his MH medication." Top Affidavit ¶ 34; exhibit 14.

The records contain reference to a number of incidents in which Mr. Tripp has been referred to as being "medication non-complian[t]." Top Affidavit ¶ 35; exhibits 11-12, 15. Mr. Tripp informed staff that he "doesn't like

14

to get up in a.m." to take his meds and that he "does not always [take them] in the SHU." Top Affidavit ¶ 35; exhibits 12, 15.

### 3.    Count III-Equal Protection: Housing Assignments

Mr. Tripp, in an Informal Resolution Request dated February 16, 2017, complained that "when I talked to Warden Allcock about why I could not live with Brim, his answer was because we have a PREA history." Schlimgen Affidavit ¶ 16; exhibit 48. According to Mr. Tripp, "He [Allcock] knows that we are both bisexual" and "therefore by saying that we have PREA history is defamation of character and sexual discrimination." Id.

In addition to wanting Warden Allcock "to be apprehended for his words," Mr. Tripp also indicated that he "would like to have my name taken off of the list because I don't have a PREA history with anyone." Schlimgen Affidavit ¶ 17; Exhibit 48.  Mr. Tripp, however, is incarcerated at the SDSP as the result of a Judgment and Sentence entered on or about January 30, 2012, finding him guilty but mentally ill to the charge of sexual contact with a minor. Schlimgen Affidavit ¶ 17; exhibit 52.

In an Informal Resolution Response dated February 23, 2017, Mr. Tripp was advised "You have no implied right or expectation to be housed in any institution, to participate in any specific program or to receive any specific service." Schlimgen Affidavit ¶18; exhibit 49. The IRR further advised Mr. Tripp that while in the custody of the DOC he was "subject to transfer from any institution, program or group." Id.

In another Informal Resolution Request dated June 19, 2017, Mr. Tripp indicated "I believe that I have the wrong PREA code" and "have never been victimized in my life." Schlimgen Affidavit ¶ 19; exhibit 50. Mr. Tripp indicated that he would therefore "like my PREA code changed to at least a no score." Id.

In an Informal Resolution Response dated June 20, 2017, staff responded "the South Dakota Department of Corrections uses a standardized, objective system of classification, assessments and screening to help identify appropriate housing, program, treatment, care and custody levels for all inmates." Schlimgen Affidavit ¶ 20; exhibit 51. Mr. Tripp was advised, "[t]he classification system applied in conjunction with assessments and screening, helps insure the safety and security of the institution, staff, inmates and the public." Id.

Pursuant to well established policy in place at the SDSP, "engaging in consensual contact and/or unnatural acts with another inmate" is deemed a serious threat to the safety and security of the institution and the inmates confined therein. Cook Affidavit ¶ 12. Such behavior/activity between inmates is thus classified as a "high level violation." Id.

An inmate found guilty of committing said rule violation, Prohibited Act L-9, is thus subject not only to disciplinary sanctions but also to a higher classification level. Cook Affidavit ¶ 13.

Finally, Mr. Tripp, as a result of his recent behavior at the SDSP, is no longer eligible to share the same cell his former cellmate. Cook Affidavit ¶ 11. As a result of his assaultive behavior within the institution, Mr. Tripp, on or

about November 3, 2017, was transferred to the JPA of the SDSP.  Cook
Affidavit ¶ 3.

Mr. Tripp, as reflected in a "Referral for Restrictive Housing Hearing"
dated November 1, 2017, assaulted a CD staff member at the SDSP School on
October 23, 2017. Cook Affidavit ¶ 4; exhibit 54. Mr. Tripp "grabbed her [SD
Staff Member] by the arm and neck." Id.  He "told DCI Agents during two
different interviews that his intent was to kill her." Cook Affidavit ¶ 5; Exhibit
54.

In a Notice dated November 13, 2017, Mr. Tripp was notified that a
hearing was being scheduled in connection with whether he should be assigned
to the Restrictive Housing Program at the SDSP based on the above behavior.
Cook Affidavit ¶ 6; exhibit 53. This Notice again reflects that Mr. Tripp
"threatened to inflict serious physical harm or injury upon a staff member, or
threatened the life of a staff member in a deliberate or reckless manner." Id.

Following the hearing, "Restrictive Housing Status Findings and
Disposition" were entered on November 15, 2017.  Mr. Tripp was recommended
for placement in Restrictive Housing due to his "serious assault on staff." Cook
Affidavit ¶ 7; exhibit 55. An Order was thereafter entered, on or about
November 20, 2017, whereby Mr. Tripp was assigned to a Restrictive Housing
Program at the SDSP. Cook Affidavit ¶ 8.

## DISCUSSION

### A.     Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Fed. Practice & Procedure, § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. Though *pro se* litigants like Mr. Tripp are entitled to a liberal construction of their pleadings, FED. R. CIV. P. 56 remains equally applicable to them. Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987). The district court is not required to "plumb the record in order to find a genuine issue of material fact." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed *pro se* in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary

dismissal of such *pro se* claims without regard for these special problems." Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980).  "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved."  Ross v. Franzen, 777 F.2d 1216, 1219 (7th Cir. 1985).

**B.    Official Capacity Claims**

Official-capacity damages claims against state officials are treated as suits against the State itself.  Kentucky v. Graham, 473 U.S. 159, 165 (1985). The Supreme Court has held that money damages are not available for § 1983 claims against state officials who are sued in their official capacities.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 64, 71 (1989).  However, prospective injunctive relief *is* available against state *officials* (though not against the state itself), when sued in their official capacities.  Will, 491 U.S. at 71 at n.10.  This is because "official-capacity actions for prospective relief are not treated as actions against the State."  Id. (quoting Graham, 473 U.S. at 167 n.14 (citing Ex Parte Young, 209 U.S. 123, 159-60 (1908))).  Therefore, an official-capacity claim for prospective injunctive relief might be asserted, for example, against an *officer* of a state university, but could not be asserted against the university itself, which is the state itself (agencies of the state are also the state for purposes of the Eleventh Amendment).  Monroe v. Arkansas State Univ., 495 F.3d 591, 594 (8th Cir. 2007).  Eleventh Amendment immunity protects the state itself from being sued.  Id.  When an official capacity claim is asserted for injunctive relief against a state officer, the

20

defense of qualified immunity does not apply.  Pearson v. Callahan, 555 U.S.
223, 242-43 (2009); Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1994).

"Because the real party in interest in an official capacity suit is the
governmental entity and not the named official, 'the entity's "policy or custom"
must have played a part in the violation of federal law.' " Hafer v. Melo, 502
U.S. 21, 25 (1991).  This is because local governmental entities can only be
held liable under § 1983 to the extent the constitutional deprivation was made
pursuant to official policy or custom of the city, county or other local
governmental unit.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S.
658, 689-90 (1978).  In official capacity suits, the only immunities available to
an individually-named defendant are the immunities that the governmental
entity possesses—i.e. usually Eleventh Amendment immunity.  Hafer, 502 U.S.
at 25.  "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a
constitutional injury is caused by 'a government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may fairly be said to
represent official policy.' " Gladden v. Richbourg, 759 F.3d 960, 968 (8th Cir.
2014) (quoting Grayson v. Ross, 454 F.3d  802, 810 (8th Cir. 2006)).  An official
policy or custom will not be inferred from the occurrence of a single incident.
Remington v. Hoopes, 611 Fed. Appx. 883, 886 (8th Cir. 2015) (citing
Wedemeier v. City of Ballwin, 931 F.2d 24, 26 (8th Cir. 1991)).

**C.    Individual Capacity Claims**

**1.    *Prima Facie* Case and Qualified Immunity**

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Tripp

must show (1) defendants acted under color or state law and (2) " 'the alleged

wrongful conduct deprived him of a constitutionally protected federal right.' "

Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of

Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from

having to defend themselves in a civil suit if the conduct of the officials "does

not violate clearly established statutory or constitutional rights." Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from

suit, not just a defense to liability at trial.  Mitchell v. Forsyth, 472 U.S. 511,

526 (1985).  Therefore, the Supreme Court has "repeatedly stressed the

importance of resolving immunity questions at the earliest possible stage in

litigation." Hunter v. Bryant, 502 U.S. 224, 536 (1991).

To determine whether an official may partake of qualified immunity, two

factors must be determined:  (1) whether the facts that plaintiff has shown

make out a violation of a constitutional right and (2) whether that

constitutional right was "clearly established" at the time of the official's acts.

Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the court finds that one of the two

elements is not met, the court need not decide the other element, and the court

may address the elements in any order it wishes "in light of the circumstances

of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " Stanton v. Sims, 571 U.S. 3, 6 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 571 U.S. at 6. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818). Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." Id. Even then, the Court has pointed out that FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id. Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of

requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence.  Id.

Federal Rule of Civil Procedure 56 governs the submission of facts and evidence in support of or opposing a party's position on summary judgment. Rule 56(c) states:

> **(c) Procedures.**
>
> > **(1) *Supporting Factual Positions.***  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> >
> > > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or;
> > >
> > > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> >
> > **(2) *Objection That a Fact is Not Supported by Admissible Evidence.***  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
> >
> > **(3) *Materials Not Cited.***  The court need not consider only the cited materials, but it may consider other materials in the record.
> >
> > **(4) *Affidavits or Declarations.***  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

See FED. R. CIV. P. 56(c).

The court may grant the motion if the record is otherwise sufficient and the opposing party fails to support its own assertion of fact, or to address the

moving party's assertion of fact as required by FED. R. CIV. P. 56(c). FED. R. CIV. P. 56(e)(3). The United States Supreme Court explained Rule 56 succinctly in Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990). "Rule 56(e) provides that judgment shall be entered against the nonmoving party unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial. The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Id.

"[C]onclusive assertions of ultimate fact are entitled to little weight when determining whether a nonmovant has shown a genuine issue of fact sufficient to overcome a summary judgment motion supported by complying affidavits." Miller v. Solem, 728 F.2d 1020, 1024 (8th Cir. 1984) (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure, § 2727 at pp. 157-59 (1983)). In Miller, the plaintiff opposed the defendants' summary judgment motion with his own affidavit which contained "sweeping conclusory allegations that both defendants intentionally failed to protect him . . ." Miller, 728 F.2d at 1025. The affidavits he submitted were deficient because (among other reasons) they contained inadmissible hearsay. Id. at 1026. The court explained the plaintiff's conclusory allegations were "unsupportable, frivolous, and cannot withstand summary judgment." Id. See also, Wells Dairy Inc. v. Travelers Indemnity Co., 241 F. Supp.2d 945, 956 (N.D. Iowa 2003) ("Hearsay statements which cannot be categorized as a hearsay exception, conclusory

allegations, legal arguments, and statements not based on personal knowledge may be stricken.") (citing cases).

### C.    Mr. Tripp's Claims for Injunctive Relief

At the outset, the court notes that in the "Request for Relief" section of his amended complaint, (Docket 13), Mr. Tripp requested several forms of injunctive relief, including an order that he be housed on a bottom tier, that prison staff disregard sexual orientation when making its decisions, and that the prison insure all medications are administered as prescribed. Id. at p. 8. The court takes judicial notice pursuant to FED. R. EVID. 201 that Mr. Tripp was moved from the SDSP to the Jameson Prison Annex (JPA) restrictive housing unit. See generally, Cook Affidavit, Docket 28. The JPA does not have multiple tiers as the SDSP does, and Mr. Tripp is ineligible to be housed with his former roommate for reasons unrelated to his sexual orientation. Id. As such, this portion of Mr. Tripp's claim for injunctive relief is moot. "A prisoner's claim for injunctive relief is moot if the prisoner is no longer subject to the conditions of which he complained." Kurtz v. Denniston, 872 F. Supp. 631, 636 (N.D. Iowa 1994). Because Mr. Tripp is no longer subject to the allegedly unconstitutional restrictions about which he complains in this lawsuit, his claims for injunctive and declaratory relief are moot. See Beaulieu v. Ludeman, 690 F.3d 1017, 1024 (8th Cir. 2012) (holding plaintiffs' case was moot because they had been transferred out of the "annex" where they argued their constitutional rights were violated); Gladson v. Iowa Dept. of Corr., 551 F.3d 825, 835 (8th Cir. 2009) (plaintiff's claims were rendered moot when he

was no longer incarcerated). Accordingly, this court respectfully recommends those claims be dismissed.

**D.     The Merits of Mr. Tripp's Claims**

**1.     Counts I & II--Mr. Tripp's Deliberate Indifference Claims**

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015). That prohibition includes prison officials' deliberate indifference to the medical needs of inmates. Id. That is because "deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05. "[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. Allegations of negligence are not enough to state a claim. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Tripp is required to show (1) that he suffered objectively serious medical needs and (2) that defendants actually knew of but deliberately disregarded those needs. Id. (citing Coleman, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784. To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). See also Docket No. 7, at page 4 (district court screening opinion). A plaintiff asserting deliberate indifference "must show more than even gross negligence"—he "must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" Allard, 779 F.3d at 771-72.

A plaintiff can show deliberate indifference by demonstrating grossly incompetent or inadequate care; showing a defendant's decision to make a less efficacious and easier course of treatment; or demonstrating that a defendant denied access to or intentionally delayed medical care. Id. at 772.

### a.    Bottom Tier Order Claim

In count I of his amended complaint, Mr. Tripp alleges the defendants were deliberately indifferent by refusing his request to enter an order to allow

him to reside on the bottom tier of the SDSP.  He alleges he was entitled to such an order because of an old injury to his leg which caused him pain when he had to climb the stairs to reach the upper tiers of the prison.

The facts in this case fall far short of establishing that any of the named defendants were deliberately indifferent to Mr. Tripp's serious medical need by their failure to enter an order for Mr. Tripp to reside on the bottom tier at the SDSP.[4]  The court analyzes this claim by separately considering the liability of the medical and non-medical defendants.

The court begins with the non-medical personnel (Associate Warden Arthur Allcock and Deputy Warden Jennifer Dreske).  In this claim for relief, Mr. Tripp has not cited any non-medical reason he needed an order for a bottom tier housing assignment.  The non-medical personnel, therefore, were entitled to rely upon the expertise of the medical staff to determine whether Mr. Tripp had a serious medical need which required a bottom tier assignment. There is no respondeat superior liability for supervisors with regard to prisoner deliberate indifference claims.  "A general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability."  Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995).  Prison officials who lack medical expertise cannot be held liable for the diagnostic decisions of medical staff.  Id. ; Holden v. Hirner, 663 F.3d 336, 343 (8th Cir. 2011).

---

[4] Although the claim for injunctive relief based on the bottom tier claim is moot, the damages claim is not.  That is because, assuming a claim could be established, Mr. Tripp would be entitled to compensation for any demonstrable harm suffered by him up to the time his housing was switched to the JPA.

Mr. Tripp specifically requested medical personnel to write an order for a bottom tier housing assignment, but after evaluation, his request was refused because medical staff determined no such order was medically necessary. Exhibit 10. In February, 2017, Mr. Tripp filed two grievances regarding his request for a medical order for a bottom tier housing assignment. See exhibits 40-41. Each time, the administrative remedy response explained that the medical providers had reviewed Mr. Tripp's records and found either that he had no need for a medical order for the bottom tier ("the flag") or that he had an appointment for further evaluation. Id. Mr. Tripp has presented no evidence, therefore, that the non-medical prison staff were deliberately indifferent by ignoring or interfering with decisions made by the medical staff. And, "prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis . . ." Holden, 663 F.3d at 343. As such, Mr. Tripp has failed to show the non-medical defendants have committed any violation of the Eighth Amendment. Defendants Allcock and Dreske are entitled to summary judgment on the merits of this claim.

Mr. Tripp also alleges Dr. Regier and Certified Nurse Practitioner Tammy Top were deliberately indifferent to his serious medical needs by failing to enter a medical order for a bottom tier housing assignment. Again, the court discerns no evidence rising to the level of deliberate indifference as to these named defendants.

Mr. Tripp first appeared at the SDSP Health Services Department requesting a bottom tier housing assignment on January 30, 2017. Exhibit 6.

At that time, he reported an old injury which resulted in a rod being placed in his femur that was causing him pain and he requested a bottom tier order.  Id. A chart review was ordered, but Mr. Tripp was advised that he may not be eligible for a bottom tier order.   Medication (Tylenol) was ordered for Mr. Tripp's reported pain.  Id.  The chart review was performed that same day (January 30, 2017) and the x-rays of Mr. Tripp's injury showed his old injury was within normal limits. Exhibit 10.  The medical provider determined, therefore, that there was "no need for a bottom tier order."  Id.

When Mr. Tripp returned to Health Services again, however, on February 21, 2017, he continued to request a bottom tier order, stating he believed he dragged his foot when climbing the stairs.  Exhibit 5.  The medical staff observed no swelling, deformity or tenderness, and again prescribed Tylenol. Exhibits 5-6.   Mr. Tripp returned to Health Services on March 6, 2017, with the same complaints and he reported pain on a scale of 8/10 with no activity, and 10/10 with climbing stairs.  He indicated he had tried Tylenol and Ibuprofen, but they did not work.  Exhibit 4.  He denied "n/t"[5] and weakness, but insisted he had just "pure pain."  Id.  He had no other medical concerns. His exam showed good strength, tone, and range of motion.  He had tenderness with palpation and demonstrated an antalgic gait when he left the exam room. Id.  At this time, the Nurse Top recommended physical therapy.  Exhibit 5.

Mr. Tripp returned to Health Services the very next day (March 7, 2017) complaining of increased pain.  Exhibits 3 & 8.  The "advanced level provider"

---

[5] This is not defined in the record but in context, the court believes it to be an abbreviation for "numbness/tingling"

(who is never identified in this record, but giving Mr. Tripp the benefit of the doubt this court assumes is Dr. Regier) was set to review his chart regarding his complaints. Exhibit 3. An appointment was made for Mr. Tripp to see the physical therapist. Exhibit 9.

When Mr. Tripp returned to Health Services to discuss his leg pain (among several other issues) on March 27, 2017, he was instructed to continue his physical therapy. Exhibit 38. He was "argumentative" but verbalized understanding. Id.

By May 30, 2017, Mr. Tripp continued to complain of worsening leg pain and to request a bottom tier order. Exhibit 2. At this time, however, Mr. Tripp did not appear to be in pain or distress. Id. He was advised to address his housing issues with DOC staff. Exhibit 8. A few days later (June 2, 2017) Mr. Tripp again demonstrated a normal gait and was able to walk normally. Exhibit 1. In fact, on many of his visits to Health Services, Mr. Tripp exhibited a normal gait. Exhibit 1 (June 2, 2017); Exhibit 3 (March 7, 2017); Exhibit 19 (September 21, 2017); Exhibit 29 (August 22, 2017). From June, 2017, forward, Mr. Tripp was seen on many occasions in the SDSP Health Services Department for various issues, but after May 30, never again indicated that his leg hurt from climbing the stairs. Top Affidavit, ¶ 24, exhibits 11-33.

Mr. Tripp complained of pain in his leg, but during the four month time frame during which Mr. Tripp complained of leg pain, he never had swelling, numbness, tingling, or any other type of outward deformity of the leg. And only occasionally did he demonstrate an abnormal gait. "Because society does not

expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' " Dulany v. Carnahan, 132 F.3d at 1239. A "serious" medical need has been described as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention," (Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)), and as "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway v. Coughlin, 37 F.3d 63, 66, 67 (2d Cir. 1994). Also, "only those deprivations denying the minimal civilized measures of life's 'necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Sieter, 501 U.S. 294, 298, (1991) (citations omitted). Under these circumstances, Mr. Tripp has not produced sufficient evidence that the leg pain caused by his having to climb the stairs at the SDSP was a sufficiently serious medical condition.

And even if he had made such a showing, the medical defendants' failure to order a bottom tier housing assignment did not rise to the level of negligence, let alone deliberate indifference. The medical defendants responded by prescribing pain medication and when that did not work, physical therapy for his sore leg.

After Mr. Tripp received these treatments for his sore leg, he continued to visit the SDSP Health Services department for other reasons after June, 2017, but never again complained about pain in his leg while climbing the stairs

(even in the interim five-month time frame before he assaulted a correctional officer in October, 2017, and was moved to the JPA, mooting his request to be moved the bottom tier at SDSP).

Mr. Tripp has not presented sufficient evidence to show that Nurse Top and Dr. Regier were both "aware of facts from which the inference could be drawn that a substantial risk of harm exists, and [that they] also dr[ew] the inference." Farmer, 511 U.S. at 837. Mr. Tripp has therefore failed to show that Nurse Top and Dr. Regier's failure to move him to a bottom tier violated the Eighth Amendment right to be free from cruel and unusual punishment.

As explained above, the two-pronged qualified immunity analysis asks whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right and if so, whether said right was clearly established at the time of the violation. Saucier, 533 U.S. at 201. Those questions can be asked and answered in whichever order the court chooses. Pearson, 555 U.S. at 236. However, if Mr. Tripp fails to show a constitutional violation, "there is no reason to reach the qualified immunity issue." Wright v. City of Philadelphia, 409 F.3d 595, 600 (3d Cir. 2005).

Should reviewing courts disagree with this court on the issue of whether the defendants violated Mr. Tripp's constitutional rights by their refusal issue a medical order for a bottom tier housing assignment, the defendants alternatively are entitled to qualified immunity as to this issue.

As explained in section C above, qualified immunity is designed to protect government officials from liability and from having to defend themselves

in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow, 457 U.S. at 818.  " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 571 U.S. at 6.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose, 474 F.3d at 1077 (quoting Hunter, 502 U.S. at 229).

There is no clearly established United States Supreme Court or Eighth Circuit precedent which has broadened beyond debate a prison inmate's Eighth Amendment rights so widely as to include the right to a medical order to reside on the lower tier of the prison based solely upon a largely subjective medical condition which by all outward appearances has completely resolved within four months.  In fact, the cases cited above suggest that an inmate does *not* have such a right.  The defendants, therefore, did not "transgress a bright line" when they did not grant Mr. Tripp's request.  Alternatively then, the defendants are entitled to qualified immunity as to this claim.  Harlow, 457 U.S. at 818; Ambrose, 474 F.3d at 1077.  For this reason as well, this court recommends the defendants' motion for summary judgment be granted as to this claim.

### b.    Failure to Open Cell Door Claim

In count II of his amended complaint, Mr. Tripp asserts that on "several occasions" Correctional Officer Vestlie failed to open his cell door for bedtime medication pass.  Docket 13, p. 6.  The only specific incident Mr. Tripp cited, however, is March 22, 2017.  Id.  Mr. Tripp asserts that he "suffers from

35

psychological disorders that make his life difficult." Id.  As a result of CO Vestlie's failure to open his cell door, Mr. Tripp alleges he did not receive his medication on that night and because he did not receive his medication, he "suffer[ed] the effects of his illnesses." Id.

In response to the defendants' motion for summary judgment, however, Mr. Tripp has presented no evidence of multiple instances in which he missed his medication caused by CO Vestlie's failure to open his cell door for medication pass.  In fact, Mr. Tripp has presented no evidence that, even on March 22, 2017, CO Vestlie was aware that he had failed to open Mr. Tripp's cell.  At most, therefore, the facts alleged in Mr. Tripp's amended complaint establish that this single alleged failure by CO Vestlie on March 22, 2017, was an inadvertent mistake, at worst rising to the level of negligence.  "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Crandell, 56 F.3d at 37.   Deliberate indifference requires a "highly culpable" state of mind, approaching actual intent.  Kulkay v. Roy, 847 F.3d 637, 643 (8th Cir. 2017) (citing Choate  7 F.3d at 1374).

And, an isolated instance of failure to receive a dosage of medication does not establish deliberate indifference.  Grace v. Hakala, 2014 WL 790786 (E.D. Mo. Feb. 26, 2014) (citing Dulany, 132 F.3d at 1245, wherein the Eighth Circuit stated "a number of individual and isolated incidences of medical malpractice or negligence do not amount to deliberate indifference."). See also Zentmyer v. Kendall County, Illinois, 220 F.3d 805, 811-12 (7th Cir. 2000)

36

("forgetting doses of medicine, however incompetent, is not enough to meet [the deliberate indifference standard].").

Though Mr. Tripp filed a grievance about the matter several days later (see exhibits 43-46), there is no evidence in the record that Mr. Tripp notified CO Vestlie[6] contemporaneously with his failure to open the cell door on the evening of March 22, 2017.  In the absence of some evidence that CO Vestlie was contemporaneously made aware, on March 22, 2017, that he had failed to open Mr. Tripp's cell door for med pass, this court cannot find that CO Vestlie was "aware of facts from which the inference could be drawn that a substantial risk of harm exists, and [that he] also dr[ew] the inference." Farmer, 511 U.S. at 837.  Mr. Tripp has therefore failed to show that CO Vestlie's failure to open his cell door for med pass on March 22, 2017, violated the Eighth Amendment right to be free from cruel and unusual punishment.

As with his Count I deliberate indifference claim, because Mr. Tripp has failed to show a constitutional violation, "there is no reason to reach the qualified immunity issue." Wright v. City of Philadelphia, 409 F.3d 595, 600 (3d Cir. 2005).

---

[6] Mr. Tripp alleges in his amended complaint that, thirty minutes after CO Vestlie failed to open the cell door on March 22, 2017, he (Mr. Tripp) asked "the next officer that came by" to call Health Services to inquire about getting his bedtime medication, but that he never heard anything more about it.  Docket 27-23.  There is no evidence in the record about whether the unnamed officer passed the information along to CO Vestlie.  Mr. Tripp has not named the "next officer" as a defendant in this lawsuit, and Mr. Tripp does not allege that he ever contemporaneously alerted *CO Vestlie* about the missed medication on March 22, 2017.

Should reviewing courts disagree with this court on the issue of whether defendant Vestlie's single failure to open Mr. Tripp's cell door for evening medication pass violated Mr. Tripp's constitutional rights, defendant Vestlie is alternatively entitled to qualified immunity as to this issue.

This is because such behavior "does not violate clearly established statutory or constitutional rights." Harlow, 457 U.S. at 818.  " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 571 U.S. at 6.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose, 474 F.3d at 1077 (quoting Hunter, 502 U.S. at 229).

There is no clearly established United States Supreme Court or Eighth Circuit precedent which has broadened beyond debate a prison inmate's Eighth Amendment rights so widely as to include the right to a receive his medications in such an exacting fashion.  In fact, the cases cited above suggest that an inmate does *not* have such a right.  Even assuming Defendant Vestlie failed to open Mr. Tripp's cell door for evening medication pass on March 22, 2017, therefore, he did not  "transgress a bright line" by this single mistake.  Alternatively then, defendant Vestlie is entitled to qualified immunity as to this claim.  Harlow, 457 U.S. at 818; Ambrose, 474 F.3d at 1077 .  For this reason as well, this court recommends the defendants' motion for summary judgment be granted as to this claim.

## 2.    Count III--Mr. Tripp's Equal Protection Claim

Finally, in Count III of his amended complaint, Mr. Tripp alleges defendants Associate Warden Allcock and Deputy Warden Dreske violated his Fourteenth Amendment right to equal protection under the law.  Docket 13, p. 7.  The basis for this claim is Mr. Tripp's assertion that Mr. Tripp and his cellmate were separated after four years of living together, and that they were separated because Mr. Tripp is bisexual. [7]

The equal protection clause requires the government to "treat similarly situated people alike," a protection that applies to prisoners.  Murphy v. Mo. Dept. of Corr., 372 F.3d 979, 984 (8th Cir. 2004).  To show an equal protection violation, Mr. Tripp must show:  (1) he is treated differently than a similarly situated class of inmates, (2) the different treatment burdens a fundamental right, and (3) there is no rational relation to any legitimate penal interest.  Id. (citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999) (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985))).

The first step in an equal protection case is determining whether the plaintiff has demonstrated different treatment than others similarly situated to him.  Murphy, 372 F.3d at 984.  "To survive summary judgment, he must identify the characteristics of the class he claims to be similarly situated to and present some evidence that other groups within the class were not also restricted in similar ways.  If there is no evidence to support the claim that

---

[7] In his amended complaint, Mr. Tripp asserts he is bisexual.  Docket 13, p. 7. In his grievance form, Mr. Tripp asserts both he and his former cellmate are bisexual.  Docket 27-48.

valid prison restrictions were applied unequally, then summary judgment is appropriate." Id. (citation omitted). In other words, "disparate treatment between classes is a threshold requirement for a traditional equal protection claim." Ryan v. City of Detroit, 174 F. Supp.3d 964, 981 (E.D. Mich. 2016) (citing Marie v. Am. Red Cross, 771 F.3d 344, 361 (6th Cir. 2014)).

In Marie, a group of Catholic nuns sued a local chapter of the Red Cross after the Red Cross terminated the nuns' volunteer relationship with the local chapter. Id. at 349. The Sisters asserted the Red Cross violated, among other things, their right to equal protection because they claimed the Red Cross terminated their volunteer relationship because of their religious beliefs. Id. The district court dismissed the plaintiffs' case on summary judgment because they failed to produce any evidence of disparate treatment. Id. at 361. On appeal, the Sixth Circuit agreed. Id. Though the Sisters claimed their religious beliefs were the reason the Red Cross terminated their volunteer relationship, the Sixth Circuit stated "the record is devoid of information that [the defendants] treated the Sisters differently than the other volunteers. The Sisters were terminated from their volunteer positions, but it appears this occurred during a routine update of the RCEMA volunteer database . . . [defendants] . . . discontinued RCEMA's volunteer relationship with the vast majority of [the] volunteers . . ." Id. The court concluded that "without evidence of disparate treatment, the Sisters cannot maintain a § 1983 claim for equal protection violations." Id. Similarly, in this case if Mr. Tripp cannot show disparate treatment, summary judgment is appropriate.

In Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 815-16 (8th Cir. 2008), the Eighth Circuit explained for a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from similarly situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." Id.   If an equal protection claim is not based on a "suspect class" or a fundamental right, it is subject to a rational basis review.  Gilmore v. County of Douglas, State of Nebraska, 406 F.3d 935, 937 (8th Cir. 2005) (citations omitted).  The rational basis review is "the paradigm of judicial restraint.  Congress does not violate the right to equal protection merely because the classifications made by its laws are imperfect, or because in practice a classification results in some inequality." Minnesota Senior Federation, Metropolitan Region v. United States, 273 F.3d 805, 808 (8th Cir. 2001) (citations omitted, punctuation altered).

The United States Supreme Court has explained the rational basis review in an equal protection analysis

> . . . is not a license for courts to judge the wisdom, fairness or logic of legislative choices.  Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.  For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.  Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.  Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification.  Instead, a classification must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

41

> A state, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on a rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality . . .

Heller v. Doe, 509 U.S. 312, 319-320 (1993) (citations omitted, punctuation altered).

"Neither prisoners nor indigents constitute a suspect class . . ." Murray v. Dosal, 150 F.3d 814, 818 (8th Cir. 1998). And "equal protection and the question of whether sexual orientation is a suspect class is a developing area of the law." Willet v. State, 2015 WL 8347105 (N.D. Iowa December 8, 2015) (citing Obergefell v. Hodges, 135 S. Ct. 2584, 2608 (2015)). The Willet court acknowledged that in Obergefell, the United States Supreme Court held that individuals cannot be denied the right to marry based on sexual orientation. Willet, at *4 (citing Obergefell, 135 S. Ct. at 2608). However, in Obergefell, the Supreme Court passed on the opportunity to find that sexual orientation is a suspect class for equal protection purposes. Id. In Willet, Judge Bennet concluded that, even after Obergefell, there is no United States Supreme Court or Eighth Circuit precedent which yet applies heightened scrutiny based on sexual orientation. Willet at *4.

The other manner in which heightened scrutiny is applied is when the different treatment burdens a fundamental right. "The United States Supreme Court has defined fundamental rights as those rights that are 'deeply rooted in this nation's history and tradition.' " Johnson v. Univ. of Iowa, 431 F.3d 325, 331 (8th Cir. 2005) (citing Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977)).

Mr. Tripp alleges it was his bisexuality which caused the prison officials to treat him differently, but he also alleges he was never in a sexual relationship with the cellmate whom he complains about being separated from after four years, and whom he asserts is also bisexual. See Docket 13, p. 7. Mr. Tripp complains that he was separated from his roommate based upon the prison officials' unsubstantiated suspicions of a sexual relationship between Mr. Tripp and his former cellmate. Mr. Tripp refers to Warden Allcock's assertion that such a relationship existed as "defamation" and "discrimination." So, it appears Mr. Tripp is not, as the defendants argue, alleging that he is being discriminated against because he should be allowed to have a sexual relationship with his cellmate. Instead, it appears Mr. Tripp is alleging he is being discriminated against because, as a bisexual prisoner, he was *suspected* of having a sexual relationship with his cellmate, and because he was not allowed to have the cellmate of his choosing.

The defendants, however, have presented undisputed evidence that, regardless of their sexual orientation: (1) sexual contact between inmates is strictly prohibited, and; (2) no inmate is entitled to choose his housing

43

assignment.  <u>See</u> Schlimgen affidavit, ¶ 18; Cook affidavit, ¶ 12; SDSP Inmate

Living Guide; https://doc.sd.gov/documents/InmateLivingGuideMay2017B.pdf

(last accessed May 1, 2018); Docket 49.  And, a prison inmate simply has no

fundamental or constitutional right to choose his cellmate.  <u>Cole v. Benson</u>,

760 F.2d 226 (8th Cir. 1985); <u>Murray v. Bledsoe</u>, 650 F.3d 246, 247 (3d Cir.

2011).   Mr. Tripp, therefore, cannot show that he, as a bisexual man, was

treated any differently than a heterosexual inmate when he was reassigned a

different cellmate—whether Mr. Tripp was engaged in an intimate relationship

with his cellmate or not.  As in <u>Marie</u>, therefore, the defendants are entitled to

summary judgment because Mr. Tripp has failed to show disparate treatment--

the threshold requirement of his equal protection claim.

Should reviewing courts disagree with this court on the issue of whether

defendants Allcock and Dreske's refusal to allow Mr. Tripp to continue living

with his former cellmate violated the equal protection clause defendants

Allcock and Dreske are alternatively entitled to qualified immunity as to this

issue.

This is because such behavior "does not violate clearly established

statutory or constitutional rights."  <u>Harlow</u>, 457 U.S. at 818.  " 'We do not

require a case directly on point' before concluding that the law is clearly

established, 'but existing precedent must have placed the statutory or

constitutional question beyond debate.' "  <u>Stanton</u>, 571 U.S. at 6.  " 'Officials

are not liable for bad guesses in gray areas; they are liable for transgressing

bright lines.' "  <u>Ambrose</u>, 474 F.3d at 1077 (quoting <u>Hunter</u>, 502 U.S. at 229).

There is no clearly established United States Supreme Court or Eighth Circuit precedent which has broadened beyond debate a prison inmate's Fourteenth Amendment rights so widely as to include the right to choose his cellmate in the face of even a mere suspicion that he is engaging in consensual sexual relations. In fact, the cases cited above suggest that an inmate does *not* have such a right. Even assuming defendants Allcock and Dreske separated Mr. Tripp from his former roommate based upon a mere suspicion of an intimate relationship between them, the defendants did not "transgress a bright line" by disallowing Mr. Tripp's continued living situation. Alternatively then, defendants Allcock and Dreske are entitled to qualified immunity as to this claim. Harlow, 457 U.S. at 818; Ambrose, 474 F.3d at 1077. For this reason as well, this court recommends the defendants' motion for summary judgment be granted as to this claim.

## CONCLUSION

Based on the foregoing law, facts and analysis, this court respectfully recommends that defendants' motion for summary judgment [Docket No. 26] be granted in its entirety and that plaintiff Kevin Christopher Micheal Tripp's complaint be dismissed with prejudice.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

45

Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 1st day of May, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge